UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

NORBERT WU,

                        Plaintiff,

        - against -

PEARSON EDUCATION, INC.,

                        Defendant.

09 Civ. 6557 (RJH)
10 Civ. 6537 (RJH)

**MEMORANDUM ORDER AND
OPINION**

Norbert Wu ("Wu") brings two purported class action suits under the Copyright Act, 17

U.S.C. § 501, on behalf of photographers who have had their copyrights infringed by Pearson

Education, Inc. ("Pearson"), a textbook publisher.  In the first action, 09 Civ. 6557 (hereinafter

"*Wu I*"), Wu alleges that Pearson engaged in a widespread practice of specifying a particular

print-run for its books when obtaining a licensing agreement for photographs, a term that was

incorporated into the licensing agreement, then exceeding the print-run, often by large numbers.

In the second action, 10 Civ. 6537 (hereinafter "*Wu II*"), Wu alleges that Pearson printed his

photographs in its books and then obtained licensing agreements only afterwards.  Wu seeks

certification of both actions for class treatment.  In addition, Pearson seeks reconsideration of the

Court's September 30, 2010 opinion regarding Pearson's motion to stay pending or, in the

alternative, to dismiss.

## BACKGROUND

Wu is a professional photographer who often licenses his photographs to appear in

publications.  Pearson is a textbook publisher that uses photographs in its publications, including

many photographs  of Wu's, for which Pearson did not own the copyright.  In order to obtain the

right to publish these photographs, Pearson would enter into licensing agreements with the

1

copyright holders.  In some instances, Pearson would obtain the rights from a photo bureau, which would enter into licensing agreements on the photographers' behalf.  Other times, Pearson would obtain a license directly from the photographer.  When Pearson obtained a license through a photo bureau, the resulting licensing agreements would frequently contain a list of photographs that Pearson was licensing from the same photo bureau on a single invoice.  In addition to a list of photographs, the front of the invoice would typically list certain details regarding the publication, such as its name and author, and then specify a print run, the number of copies of the book that Pearson was licensed to print.  On the back of the invoice would typically be listed pre-printed standard terms.  When Pearson entered into licensing agreements with individual photographers, the agreements would be of varying degrees of formality.

According to Wu, Pearson has not adhered faithfully to the terms of these licensing agreements.  He has brought two separate actions alleging that Pearson engaged in widespread copyright infringement.  In *Wu I*, Wu alleges that Pearson routinely exceeded the print run specified in the licensing agreements without alerting photographers or the photo bureaus to this fact.  Wu states that of the 144 total Pearson publications that featured his photographs, Pearson exceeded the print run for "almost 40" of the publications.  (Pl.'s Mem. 7.)  In *Wu II*, Wu alleges that Pearson often printed photographs in its textbooks without first obtaining a license for them.  After it had begun printing, Pearson would obtain licenses for the photographs, but according to Wu without notifying the photo bureaus or copyright holders that it had already been using the photographs.  In doing so, Pearson sought to avoid paying the penalty provisions that copyright holders frequently employ for retroactive licenses.  Wu alleges that Pearson engaged in this practice in a widespread manner and that potentially thousands of photographers were affected by Pearson's practices.

## PROCEDURAL HISTORY

Wu initially brought suit in *Wu I* under federal copyright law as well as a variety of state law causes of action.  Pearson filed a motion to stay pending arbitration or, in the alternative, to dismiss.  On September 30, 2010, the Court granted defendant's motion to stay Wu's state law claims with respect to two of the three photo bureaus through which Wu licensed his photographs:  Minden Pictures, Inc. ("Minden Pictures") and Peter Arnold, Inc. ("Peter Arnold").  It denied Pearson's motion to stay Wu's copyright claims pending the outcome of arbitration.  At the time Pearson filed its motion to dismiss, it had not located the invoice pertaining to the one photograph licensed through the third photo bureau, identified as Animals Animals in the complaint.  The Court denied Pearson's motion to dismiss with respect to these claims, but noted that these claims might eventually be dismissed or stayed if Pearson were able to locate the invoice and its terms so provided.  In addition, the Court dismissed Wu's claims pertaining to pictures licensed through Peter Arnold because the licensing agreement contained a condition precedent that required Pearson to receive and refuse to pay an invoice billing for unauthorized use before a copyright suit could be brought.

On January 5, 2011, Pearson moved for reconsideration of the Court's opinion regarding its motion to dismiss.  On January 10, 2011, after receiving leave from the Court, Wu filed a Second Amended Complaint alleging that performance of the condition precedent in the Peter Arnold agreement was excused because Pearson frustrated Wu's performance.  Wu alleged that he requested information from Pearson pertaining to the excess use of his photographs, and Pearson refused to provide the information.

With regards to his class certification motion, Wu seeks certification of the following class for both sets of allegations:

> [All] persons or entities entitled to bring copyright claims in their own name or on behalf of photographers or other copyright holders (referred to herein as "content owners" or "copyright claimaints") whose photographic works either (1) were used by Defendant in publications that exceeded the authorized print run; or (2) were published by Defendant prior to Defendant's obtaining a license to use the image.

(Pl.'s Mem. 5.)  The class would exclude author-supplied images, any images for which Pearson owns the exclusive copyright, and images licensed to Pearson royalty-free.

Wu also proposes two subclasses, a subclass consisting of all class members whose works appear in the same publications as Wu and a subclass consisting of members whose content was licensed on the same invoices as Wu's.

## DISCUSSION

### I.    Pearson's Motion for Reconsideration

Pearson moves for reconsideration of the Court's September 30, 2010 opinion denying Pearson's motion to dismiss.  Pearson moves for reconsideration on two grounds.  First, it argues that Wu's copyright claims stemming from the Minden Pictures agreement should be stayed pending the outcome of arbitration because Wu's copyright claims are inextricably intertwined with his state law claims, which the court has stayed pending arbitration.  Second, it asks the Court for reconsideration with regards to the picture licensed through Animals Animals because it has located the invoice covering this claim.

Under Local Civil Rule 6.3, reconsideration is appropriate if the Court overlooked controlling decisions or factual matters which, had they been considered, might reasonably have altered the result of the underlying decision.  *E.g.*, *Levine v. AtriCure, Inc.*, 594 F. Supp. 2d 471, 474 (S.D.N.Y. 2009).  To that end, "[a]ny controlling decisions or factual matters presented by a litigant for reconsideration must have been put before the Court in the underlying motion." *Padilla v. Maersk Line, Ltd.*, 636 F. Supp. 2d 256, 258 (S.D.N.Y. 2009).  Further, "a motion for

reconsideration is not a motion to reargue those issues already considered when a party does not like the way the original motion was resolved."  *Finkelstein v. Mardkha*, 518 F. Supp. 2d 609, 611 (S.D.N.Y. 2007).

The Court has already considered and rejected Pearson's argument that the copyright claims should be stayed pending the outcome of arbitration.  The Minden Pictures agreement specifically carves out copyright claims from those that are subject to arbitration and states that they may be litigated in federal court.  To stay the claims pending arbitration would do violence to the intent of the parties.  Furthermore, the contractual issues at stake here appear to be minimal.  Pearson has made no argument that would cause the Court to reconsider its decision.[1]

Pearson next argues that the Court should stay Wu's claims pertaining to a picture Wu identified as being licensed through Animals Animals in his complaint.  Pearson states that the picture in question was in fact licensed through Getty Images, Inc. ("Getty") and that the Getty license terms contain an arbitration provision.  Wu argues that it is procedurally improper for Pearson to make such an argument on reconsideration and argues that the Court should instead convert this portion of Pearson's motion as one for summary judgment under Rule 56.  The motion is so converted, and the Court will consider the language of the Getty licensing agreement.  (Church Decl. Ex. J.)  Paragraph 10.5 of this agreement provides:

> Any disputes arising from this Agreement or its enforceability shall be settled by binding arbitration to be held in one of the following jurisdictions . . . . Notwithstanding the foregoing, Getty Images shall have the right to commence and prosecute any legal or equitable action or proceeding before any court of competent jurisdiction to obtain injunctive or other relief against Licensee in the event that, in the opinion of Getty Images, such action is necessary or desireable.

---

[1] Pearson also cited certain language that could be read to create a condition precedent, perhaps hoping that the Court would consider an argument that Pearson did not make in its original motion papers.  The Court notes, however, that the language Pearson cites did not appear in the licensing agreement, but rather was taken from the Minden Pictures website.  The licensing agreement makes no reference to the website, and Pearson makes no argument as to why this term should be read into the language of the contract.

(*Id*. at 5.)

Wu does not contest that this clause requires him to arbitrate his state law claims. But he argues that the licensing agreement contains a carve-out for copyright claims. Paragraph 10.1 provides, "Any use of Licensed Material in a manner not expressly authorized by this Agreement or in breach of a term of this Agreement constitutes copyright infringement, entitling Getty Images to exercise all rights and remedies available to it under copyright laws around the world." Wu argues that the right to bring a suit for infringement is a right or remedy available under the copyright law. The Court does not agree with Wu's interpretation of the contract. It may be that Wu will have the right to seek damages from Pearson or enjoin Pearson from further violations of his copyright, meaning he can exercise all rights and remedies against Pearson, but the clause does not say anything about the forum where Wu has the right to enforce those rights and remedies. Read in conjunction with the broad arbitration agreement, this clause does not create the sort of carve-out that Wu claims. *See Robert Bosch Corp. v. ASC, Inc.*, 195 F. App'x 503, 507 (6th Cir. 2006) (holding in a battle of the forms inquiry that a term reserving all rights and remedies for one party did not conflict with an arbitration provision).

## II.    Class Certification—Wu I

Pursuant to Rule 23(a), plaintiffs must demonstrate that four conditions have been met before a court will certify a class: (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class. Fed. R. Civ. P. 23(a); *Teamsters Local 445 Freight Div. Pension Fund v. Bombardier, Inc.*, 546 F.3d 196, 201-02 (2d Cir. 2008). In addition, the courts have read a fifth "implied requirement of

6

ascertainability" with respect to the class definition.  *In re Initial Pub. Offerings Sec. Litig.*, 471 F.3d 24, 30 (2d Cir. 2006).

Plaintiffs must also demonstrate that a class action is maintainable under one of several different theories.  Here, plaintiff argues primarily that the class action is maintainable pursuant to Rule 23(b)(3), which requires a court to find (1) that questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and (2) that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.  Fed. R. Civ. P. 23(b)(3); *Myers v. Hertz Corp.*, 624 F.3d 537, 547 (2d Cir. 2010). The plaintiff bears the burden of showing each of these elements by a preponderance of the evidence.  *Teamsters Local*, 546 F.3d at 202.  Plaintiff also contends that both classes are certifiable under Rule 23(b)(1)(B) and (2).  Certification pursuant to Rule 23(b)(1)(B) is appropriate where "adjudications with respect to individual members of the class would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests." Certification under Rule 23(b)(2) is appropriate where "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."

With certain exceptions that will be discussed in greater detail below, Pearson does not dispute that Wu has met the requirements of Rule 23(a).  Rather, it focuses it focuses on the predominance requirement of Rule 23(b)(3).  The Court will follow suit and begin its analysis with Rule 23(b)(3) before returning to the Rule 23(a) requirements.  It will consider each action in turn.

### A. Predominance

Wu argues that class treatment is appropriate under Rule 23(b)(3), which requires that "questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and . . . [that] a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). "[T]o find predominance, a Court must consider the elements of each cause of action, and determine whether those elements can be satisfied by common, class-wide proof." *In re Currency Conversion Fee Antitrust Litig.*, 230 F.R.D. 303, 309-10 (S.D.N.Y. 2004). Common questions predominate only if plaintiffs can show that "those issues in the proposed action that are subject to generalized proof outweigh those issues that are subject to individualized proof." *Heerwagen v. Clear Channel Commc'ns*, 435 F.3d 219, 226 (2d Cir. 2006).

Wu argues that the number of common issues is substantial, and that these common issues predominate over individual claims. All of the claims in this case revolve around the same issue of law, namely whether Pearson violated the copyright holder's rights by exceeding the print-runs specified in the licensing agreements. Wu predicts that at a later stage in the litigation, Pearson will argue that the accepted understanding in the trade was that print-runs were merely estimates, rather than definite limitations. (Wu Mem. 20-21.) This question certainly represents a common question of law typical to the class. In addition, copyright holders are entitled to a greater recovery where the infringement was committed willfully. 17 U.S.C. § 504(c)(2). "To prove 'willfulness' under the Copyright Act, the plaintiff must show (1) that the defendant was actually aware of the infringing activity, or (2) that the defendant's actions were the result of 'reckless disregard' for, or 'willful blindness' to, the copyright holder's rights." *Island Software and Computer Serv., Inc. v. Microsoft Corp.*, 413 F.3d 257, 263 (2d Cir. 2005).

Wu states that he intends to demonstrate willfulness by pointing to the fact that Pearson has failed to put in place a system for tracking when it has exceeded the print-run specified in a licensing agreement, has consistently underestimated the print-runs it would need, and has resisted the attempts of copyright holders to uncover whether it has exceeded the print-runs specified in the licensing agreements.  (Wu Mem. 22.)  Wu argues that none of this evidence of Pearson's practices is tied to a particular photograph, but rather applies equally to all photographs in the class.

Pearson counters that individual issues predominate because licensing agreements between Pearson and the copyright holders varied significantly in their terms.  Pearson's argument begins with a premise that is legally correct, specifically that although federal law creates Wu's cause of action for copyright infringement, 17 U.S.C. § 501(b), where, as here, a court must determine whether infringement has occurred by determining the scope of a licensing agreement, it construes the terms of the licensing agreement in accordance with state contract law, *Graham v. James*, 144 F.3d 229, 237 (2d Cir. 1998).  Pearson argues that the process of construing the licensing agreements in accordance with each state's law will prove unduly onerous.  It seems that Pearson's general practice was to send a billing request to a photo bureau or an individual photographer and indicate that it wished to publish a particular photograph in a particular textbook.  The billing request would contain specifics regarding the print-run.  The photo bureau or individual party would then send back an invoice.  When the photo bureaus sent invoices, the invoices would usually contain a list of individual terms on the back that governed such issues as choice of law, forum, and arbitration.  Pearson makes two arguments related to these terms.  First, it argues that the requirement that the Court scrutinize many different contracts itself defeats predominance.  Second, it argues that the fact that the Court will be

9

required to conduct an individualized analysis to determine whether these additional terms are binding means that individual issues will swamp common issues.

The case law reveals that courts have adopted two rules of thumb with regards to class certification in breach of contract cases.  On the one hand, where adjudicating breach of contract claims require "numerous individual inquiries . . . to determine whether a breach of contract could be found," class treatment will generally not be appropriate.  *Jim Ball Pontaic-Buick-GMC, Inc. v. DHL Exp. (USA), Inc.*, 08 Civ. 761C, 2011 WL 815209, at *6 (W.D.N.Y. Mar. 2, 2011) (collecting cases).  On the other, "claims arising from interpretations of a form contract appear to present the classic case for treatment as a class action, and breach of contract cases are routinely certified as such."  *Steinberg v. Nationwide Mut. Ins. Co.*, 224 F.R.D. 67, 74 (E.D.N.Y. 2004) (quoting *Klay v. Humana, Inc.*, 382 F.3d 1241 (11th Cir. 2004)).  This case falls somewhere in between these two extremes.  It is not in dispute that if it certifies a class, the Court will be called upon to consider contracts that take a number of different forms.  But at its core, the claims here require the interpretation of a single provision that varies little in its form from contract to contract, specifically that Pearson is authorized to print no more than a specified number of books.

Courts faced with similar circumstances have certified cases for class treatment as long as the relevant provisions were similar.  For example, in *Steinberg* the court considered whether class certification was appropriate for a plaintiff who alleged that a particular fee breached the terms of his insurance contract.  224 F.R.D. at 69.  The defendant contended that class treatment was not appropriate on a nationwide basis because the form insurance contracts it used varied from state to state.  *Id*. at 76.  The court found, however, that the provisions relevant to the litigation were similar across contracts and so individual issues related to each contract did not

predominate.  *Id*. at 79-80; *see also Allapattah Servs., Inc. v. Exxon Corp.*, 333 F.3d 1248, 1261 (11th Cir. 2003) (upholding class certification of breach of contract claims where the contracts differed, but were the same with regards to material terms).   The Court's task, then, is to determine whether the contracts are similar with regards to their material provisions.   The print-run terms seem to involve similar promises that would be susceptible to class treatment.  Pearson argues, however, that the Court must consider *other* provisions in the contract that vary from contract to contract and that these issues preclude certification.   The Court will consider each of these issues in turn.

  1.  *Clauses Restricting Where Suit May Be Brought*

A number of the agreements contain clauses that require arbitration of certain or all claims.  Many, such as the Minden Pictures and Peter Arnold agreements the Court interpreted on motion to dismiss, contain carve-outs for copyright claims.  Pearson represents that others require arbitration of all claims, including copyright.  Other licenses include forum selection clauses that are incompatible with litigation the Southern District of New York.  Pearson argues that interpreting these terms will require a significant individualized analysis.  The Court disagrees.  The Court is aware of no case that suggests that forum selection clauses lose their force in the context of a class action, and courts have found that arbitration clauses prevent litigation through the vehicle of a class action, *see In re Conversion Fee Antitrust Litig.*, 224 F.R.D. 555, 569-70 (S.D.N.Y. 2004) (declining to enforce arbitration clauses in a class action suit where credit card companies snuck the arbitration clauses into cardholder agreements following the commencement of litigation, but holding that arbitration clauses where enforceable where the cardholder agreements contained such clauses prior to the commencement of litigation).  Nonetheless, it does not require a great deal of legal acumen to spot a forum selection

or arbitration clause in a form contract, and the Court believes that the best method for managing this issue is to exclude copyright holders whose licensing agreements contain forum selection clauses or provisions requiring the arbitration of copyright claims from the class definition.

    *2.   Conditions Precedent*

       Pearson argues that some of the licensing agreements contain conditions precedent of the sort contained in the Peter Arnold agreement.  The condition precedent stated that Peter Arnold must invoice Pearson for use in excess of the agreement before Pearson could be sued.  Wu alleges in his second amended complaint that it was impossible for him to fulfill this condition because Pearson has refused to divulge to copyright holders how many copies of each publication it has printed.  Pearson conceded at oral argument that it was not its standard practice to notify photographers or the photo bureaus when it exceeded a print-run limit.  Without such notice, no photographer would have the means of determining whether Pearson had exceeded the scope of the license.  Without determining whether this set of facts, if proven, would establish excuse on the grounds of impossibility, Wu's argument is shared among each of the class members who might be subject to such a condition and appears susceptible to class-wide proof. As a matter of caution, the Court believes it desirable to create a subclass of those licensing agreements that contain condition precedents so that the Court may revisit this issue as discovery proceeds consistent with its responsibilities under Rule 23(c)(1)(C).  *MacNamara v. City of New York*, 275 F.R.D. 125 (S.D.N.Y. 2011).

    *3.   Standing Provisions*

       Pearson argues that a number of the contracts contain particular provisions that govern who may bring suit for claims of copyright infringement.  Some of the licensing agreements contain provisions stating that the photo bureau may bring suit, providing by implication,

Pearson argues, that the photographers may not bring suit.  Pearson also observes that some of the agreements Wu entered into with the photo bureaus provided that the photo bureaus would have the exclusive right to bring suit.  Pearson predicts that many other photographers entered into similar arrangements.

To the extent that the licensing agreements or the contracts between the photo bureaus and the photographers specify that only the photo bureaus may bring suit, they are likely unenforceable.  Pearson concedes that at least one party must be allowed to bring suit for copyright infringement.  The Copyright Act entitles only "the legal owner legal or beneficial owner of an exclusive right under a copyright" to bring a suit for copyright infringement.  17 U.S.C. 501(b); *see also Eden Toys, Inc. v. Florelee Undergarment Co.*, 697 F.2d 27, 32 (2d Cir. N.Y. 1982).  Copyright holders may not grant third parties standing to sue under the Copyright Act.  *Eden Toys*, 697 F.2d at 32 n.3; *accord ABKCO Music, Inc. v. Harrisongs Music, Ltd.*, 944 F.2d 971, 980 (2d Cir. 1991); *Peer Int'l Corp. v. Latin Am. Music Corp.*, 161 F. Supp. 2d 38, 53 (D.P.R. 2001).  Further, copyright holders may not grant the exclusive right to sue to a third party and thereby bring the third party within the rubric of an "owner of an exclusive right" because the right to bring suit is not an exclusive right recognized by the Copyright Act in 17 U.S.C. § 106.  *Silvers v. Sony Pictures Entm't, Inc.*, 402 F.3d 881, 884-85 (9th Cir. 2005).[2]

---

[2] 17 U.S.C. § 106 provides:

   Subject to sections 107 through 122, the owner of copyright under this title has the exclusive rights to do and to authorize any of the following:

      (1) to reproduce the copyrighted work in copies or phonorecords;

      (2) to prepare derivative works based upon the copyrighted work;

      (3) to distribute copies or phonorecords of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending;

      (4) in the case of literary, musical, dramatic, and choreographic works,

In any event, the Court notes that Wu's definition does not exclude photo bureaus to the extent that they are "entitled to bring copyright claims in their own name or on behalf of photographers . . . ." Pearson claims that because Wu is not a photo bureau, he cannot represent class members who are. But this argument misses the point: Wu seeks to represent copyright holders. If a photo bureau happens to be a copyright holder in a given case—although this would appear to be unusual—the Court sees no reason why Wu cannot adequately represent the bureau's interest as such.[3]

### 4. *Covenant versus Condition*

Pearson argues that the Court will be required to conduct an individualized analysis of the contract to determine whether the print-run term was a covenant or a condition. As a general matter, "[a] copyright owner who grants a nonexclusive license to use his copyrighted material waives his right to sue the licensee for copyright infringement." *Graham v. James*, 144 F.3d 229, 236 (2d Cir. 1998). When a licensee fails to comply with the terms of the license agreement, the Court must determine whether the violated term was merely a covenant or a condition precedent. *Id*. at 236-37. If the term is a condition, the copyright holder will still have

---

pantomimes, and motion pictures and other audiovisual works, to perform the copyrighted work publicly;

 (5) in the case of literary, musical, dramatic, and choreographic works, pantomimes, and pictorial, graphic, or sculptural works, including the individual images of a motion picture or other audiovisual work, to display the copyrighted work publicly; and

 (6) in the case of sound recordings, to perform the copyrighted work publicly by means of a digital audio transmission.

[3] Pearson makes several other observations regarding differences among the agreements between individual photographers and the photo bureaus. Different agreements provide for different sharing of licensing fees between the photo bureaus and the photographers. Pearson has made no argument as to why this difference is relevant in the instant suit. Similarly, Pearson points out that different agreements provide the photo bureaus with varying amounts of authority to enter into different types of agreements. Wu does not argue that the photo bureaus were without authority to license his photographs, so it is unclear how these differences are relevant.

a cause of action for copyright infringement because the license is not effective unless the licensee fulfills the condition.  *Id*.  But if the contested term is merely a covenant, the copyright holder can sue only for breach of contract.  *Id*.  "After expiration of a license, further exercise by the licensee of the licensed exploitation rights constitutes copyright infringement.  More generally, when a license is limited in scope, exploitation of the copyrighted work outside the specified limits constitutes infringement."  NIMMER ON COPYRIGHT § 10.15.

Pearson argues that the Court must conduct an individualized analysis of each contract to determine whether the print run consisted of a condition or a covenant.  This argument is seriously flawed.  The Court will not be required to conduct the sort of individualized analysis that Pearson foretells.  First, the vast majority of the contracts use the term "print-run," "circulation," or some similar term.  They do not appear to provide further explanation for this term that varies contract to contract, meaning that analysis of the term would likely not differ significantly.  An examination of a case that has considered this very issue supports this conclusion.  In *Wood v. Houghton Mifflin Harcourt Publ'g Co.*, the court addressed whether a print-run placed a limitation of the scope of the licensing agreement, in other words whether the copyright holder was allowed to bring an infringement suit for failure to comply with this term.  589 F. Supp. 2d 1230, 1238-39 (D. Colo. 2008).  The court concluded that an apparently standard print-run provision constituted a specific limitation as to the scope of the licensing agreement.  *Id*.  The Court need not decide whether to follow the *Wood* court at this stage in the litigation, but the *Wood* court's analysis further suggests that the question of whether the print-run creates a limit to the scope of the licensing agreement will be determined by common, rather than individual, proof.

5.   *Choice of Law and Battle of the Forms*

Pearson observes that a number of the contracts contain choice of law provisions.  It argues that for the remaining contracts, the Court will be required to conduct an individualized choice of law analysis.  According to Pearson, the burden of conducting this analysis and then applying the law of many different states will lead individual issues to predominate.  It is true, of course, that "[f]ederal courts sitting in diversity look to the choice-of-law rules of the forum state." *Int'l Bus. Machs. Corp. v. Liberty Mut. Ins. Co.,* 363 F.3d 137, 143 (2d Cir. 2004).  And under New York choice-of-law rules, "the first step" is to determine "whether there is an actual conflict between the laws invoked by the parties." *Booking v. Gen. Star Mgmt. Co.,* 254 F.3d 414, 419 (2d Cir. 2001) (citation omitted).  But Pearson has not pointed to any conflict between the laws of the fifty states that would trigger a choice of law analysis or fracture the Court's substantive analysis.

The most important term of the contract is the print-run term, specifically whether it imposes an actual limitation on Pearson's authorization to publish the photographs or whether, as Wu predicts Pearson will argue, the term merely constitutes an estimate of how many copies Pearson will publish.  Pearson has not cited any case that suggests that the law of the various states would vary on this issue, and the Court doubts seriously that different courts would come to different determinations as to the plain meaning of a contract term.  *See Am. Airlines v. Wolens*, 513 U.S. 219, 233 n.8 (1995) ("[C]ontract law is not at its core diverse, nonuniform, and confusing.") (internal citation and quotations omitted).

Pearson also argues that state law will vary on how to resolve a "battle of the forms" that Pearson claims is brewing in the underlying documentation.  A typical battle of the forms occurs when two commercial parties orally agree to certain terms and then exchange formal written

acknowledgements that embody the oral agreement, but contain additional terms that are often in conflict with one another. *Peters Fabrics, Inc. v. Jantzen, Inc.*, 582 F. Supp. 1287, 1289 n.2 (S.D.N.Y. 1984). For a typical sale of goods contract, the courts determine which of these terms applies by applying U.C.C. § 2-207, which provides that additional terms are to become the language of the contract unless "(a) the offer expressly limits acceptance to the terms of the offer; (b) they materially alter it; or (c) notification of objection to them has already been given or is given within a reasonable time after notice of them is received." U.C.C. § 2-207(2).[4]

When Pearson sought permission to print a photograph in one of its textbooks, it would send a billing request to the photo bureau that would list publication details for the books, including a proposed print-run. The photo bureau would then send back an invoice that largely copied the details from the billing request on the front and contained a list of standard terms on the back. Pearson argues that the agreement between the parties is captured not by a single document, the invoice, but rather by the interaction between the two documents. It further represents that different of Pearson's departments used different versions of the forms, further increasing the variations that the Court will need to examine.

Analyzing Pearson's arguments is a bit like opening a box, only to find that it contains a smaller box inside. Pearson argues in vague terms that state law differs on issues such as how to resolve the battle of the forms, then describes in equally vague terms which so-called battle the Court will be called upon to resolve. While Pearson devotes a great deal of ink in its brief to arguing that resolving battle of the forms inquiries is too complex for resolution on a class-wide basis, it devotes much less space to pointing out outcome determinative conflicts in the various

---

[4] Pearson suggests that the U.C.C. is not applicable to licensing agreements in all states. A number of the agreements themselves, including the Minden Pictures and Peter Arnold agreements, contain provisions stating that the U.C.C. applies. Nonetheless, the Court's reference to the U.C.C. is mainly for illustrative purposes.

forms.  Based on the Court's review of the exhibits, it appears that Pearson sent out standard

form billing requests that proposed a list of photographs to be used in a specified textbook and,

importantly, provided for a particular print run.  The photo bureau responded by producing an

invoice that parroted back these terms, including the print-run, and added additional terms on the

back.  With regards to the terms on the back, it appears that the photo bureaus employed

standardized terms although there is variation among the forms used.  But except for the few

provisions that the Court has analyzed above, Pearson fails to identify differences in the terms

that could affect the liability issues in this case.

Pearson does identify a few discrete instances where there is a discrepancy between the

print-run requested by Pearson and the print-run listed by the photo bureau in their final invoice.

Approximately forty of invoices that bill for Wu's photographs contain print overrun claims.

Pearson has identified two instances among these invoices where there is a discrepancy between

the print-run on Pearson's billing request and on the final invoice prepared by the photo bureau.

(Def.'s Opp'n 17.)  In one instance, the billing request and invoice both provide for a print run of

up to 300,000, but the invoice has the term 300,000 crossed out and the number 500,000

handwritten in.  (*Id*.)  In another instance, the billing request lists a print run of up to 40,000, but

the invoice does not list a print run at all.  (*Id*.)  Pearson has also identified discrepancies in eight

other invoices that would be involved in this suit, but the Court could not determine how many

invoices Pearson scrutinized in order to locate these discrepancies.  These discrepancies are thus

not instructive in estimating the approximate percentage overall that will require individualized

scrutiny.  It seems that these sorts of discrepancies, while they do occur, are relatively rare in

comparison to the larger number of invoices that do not contain such discrepancies.  Such

discrepancies as may exist are better addressed if and when damages are assessed in a claims

18

procedure.  Alternatively, the Court may refine the class at a later date to exclude invoices that are inconsistent with Pearson's billing request regarding the print-run term.

Pearson argues that the need to determine the meaning of the contract in instances like these will defeat predominance.  But the mere fact that some individual questions exist is not sufficient to defeat predominance.  *Brown v. Kelly*, 609 F.3d 467, 483 (2d Cir. 2010) ("We acknowledge that the district court will be required to make individualized inquiries with respect to some of the plaintiffs and some of the claims. We conclude, however, that it was within the district court's discretion to find that common issues predominated.") (upholding certification of individuals criminally charged pursuant to a statute previously ruled to be unconstitutional).  Judge Sand faced a set of facts similar to those in the case at bar in *Spicer v. Pier Sixty, LLC*, 269 F.R.D. 321 (S.D.N.Y. 2010).  There, servers at private banquets sued, claiming that their employer improperly withheld a portion of a mandatory service charge applied to the bill.  *Id*. at 327.  Most clients were made aware of the charge because it was described in one of two form contracts that the banquet hall used.  *Id*.  On rare occasions, clients inquired as to what the service charge covered, and the employer would provide further explanation.  *Id*.

In order to determine whether the employer was proper in withholding a portion of the service charge, Judge Sand was required to apply a totality of the circumstances test to determine whether the reasonable client for each event would have understood that the service charge was a substitute for a gratuity.  *Id*. at 338.  He determined that in most instances, the factual inquiry surrounding what the reasonable client would have understood would be exactly the same because the defendant employers used the same contract for each event and most clients sought no more information than what was printed in the contract.  *Id*.  Common questions predominated notwithstanding the fact that the Court would be required in select instances to

19

inquire into the representations made to each client.  *Id*.  Judge Sand's approach is instructive.  In the vast majority of cases, it appears that the there are no discrepancies between the billing requests and the invoices, and the Court will be called upon to interpret the same or similar language regarding print-run.  It might be the case that in select instances, the Court will be required to inquire into the terms of a particular contract.  But these issues will arise relatively infrequently and will not overwhelm the numerous common legal and factual issues.  The Court is not persuaded that either choice of law issues or battle of the forms issues will defeat predominance.  The one exception, however, is those agreements that require the application of foreign law.  Those agreements that must be construed in accordance with the laws of another country will not be included in the class definition.

   *6.  Fraud*

   Pearson also argues that predominance is defeated by the need to show reliance for each of its fraud claims.  (Def.'s Opp'n 38-40.)  The Court has stayed all of Wu's fraud claims pending arbitration.  Wu does not advance any argument that these claims should be certified.  Fraud claims, therefore, are irrelevant to the Court's predominance inquiry.

   *7.  Registration*

   Pearson claims that determining whether individual photographs have been properly registered will require individualized analysis that will defeat predominance.  Although Pearson makes vague pronouncements to the effect that determining whether a particular photograph has been registered "can be quite complex," (Defs.' Mem. 41), Pearson provides little explanation as to why answering this question will be burdensome in this case.  The Court has reviewed a number of copyright cases in this District and found few in which registration is a litigated issue.  Pearson has identified one of these cases, *Muench Photography, Inc. v. Houghton Mifflin*

*Harcourt Publ'g Co.*, 712 F. Supp. 2d 84, 95 (S.D.N.Y. 2010), in which Judge Preska held that

compilation registrations filed by photo bureaus on behalf of photographers were not valid

registrations. Judge Preska determined that an entire method of registration was invalid. Should

this Court adopt Judge Preska's reasoning, it will exclude such compilations from the class. This

should be a relatively simple task. This determination would not involve, for example, deciding

whether a registration extended to a particular object as is necessary in interpreting a design

copyright. *Cf. Nicholls v. Tufenkian Import/Export Ventures, Inc.*, 367 F. Supp. 2d 514, 520

(S.D.N.Y. 2005) (adjudicating whether a rug registered in a particular color with the Copyright

Office also covered the same pattern in a different color).

    Further, at least one court has specifically considered and rejected the argument that

consideration of individual copyright registration defeats predominance. In *In re Napster

Copyright Litig.*, the court considered whether to certify a class of copyright holders who alleged

that their musical works had been shared through Napster, a popular, but now defunct peer-to-

peer file sharing service. 04 Civ. 1671, 2005 WL 1287611 (N. D. Cal. June 1, 2005). The court

determined that even though it would be required to make a work-by-work analysis of issues

surrounding proof of ownership, registration, and damages, these individualized determinations

were less significant than the uniting fact that each violation occurred through the same file-

sharing system. *Id*. at *6. In the end, although Pearson has raised the specter of individual issues

with regards to copyright registration, it has done little to substantiate its claim. The Court

believes that, as in *Napster*, registration will not create insurmountable issues.

## 8. *Statute of Limitations*

    Finally, Pearson argues that determining the applicable statute of limitations will require

an individualized inquiry. The Copyright Act specifies that claims for infringement must be

brought within three years.  17 U.S.C. § 507(b).  If individual acts of infringement occurred

within three years of the date of filing, it is clear that the copyright holder has satisfied the statute

of limitations.  *Auscape Int'l v. Nat'l Geographic. Soc.*, 409 F. Supp. 2d 235, 241 (S.D.N.Y.

2004).  Pearson appears to argue that this period may be muddied if plaintiffs argue that a

discovery rule should apply instead.  (Def.'s Mem. 40-41.)  Under such a rule, copyright claims

would accrue when a plaintiff "knows or has reason to know" of the alleged infringement.

*Auscape*, 409 F. Supp. 2d at 242.  The status of the discovery rule within this Circuit is unclear.

*Id*. at 242-248 (concluding after an exhaustive analysis that the discovery rule should not apply

in copyright claims, but noting that a number of courts in this district had reached the opposite

conclusion).  It is not appropriate for the Court to consider the merits of the discovery rule at this

juncture, nor have the parties briefed the issue in any meaningful way.  In any event, the Court

notes that plaintiff's argument for extending the statute of limitations is premised on class-wide

proof that Pearson's practice was not to disclose over-run information to any copyright holders.

### B.  Superiority

The superiority question under Rule 23(b)(3)  requires a court to consider whether a class

action is superior to other methods of adjudication. The court should consider, *inter alia*, "the

interest of the members of the class in individually controlling the prosecution or defense of

separate actions" and "the difficulties likely to be encountered in the management of a class

action."  Fed. R. Civ. P. 23(b)(3).  "[F]ailure to certify an action under Rule 23(b)(3) on the sole

ground that it would be unmanageable is disfavored and should be the exception rather than the

rule."  *In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d. 124, 140 (2d Cir. 2001)

(internal quotations and citations omitted).

Class action is the superior method for resolving this dispute for several different reasons. First, Wu has argued forcefully that after he filed this lawsuit, Pearson stopped publishing his photographs in its textbooks.  Because Wu is a professional photographer, Pearson's alleged actions have threatened his livelihood.  Class treatment is often the superior method of resolving claims where "there is reason to believe that class members may fear reprisal . . . ." *Noble v. 93 Univ. Place Corp.*, 224 F.R.D. 330, 346 (S.D.N.Y. 2004).  Wu also represents that Pearson has been extremely secretive about its overruns and has even adopted a policy that it will not reveal information about its print-runs to photographers unless they agree not to use the information in subsequent litigation.  It seems unlikely that individual photographers will gain the necessary information to file suit except through the device of a class action.  Courts have often opined that "[i]t is appropriate for the court to consider the inability of the . . . uninformed to enforce their rights . . . ." *Casale v. Kelly*, 257 F.R.D. 396, 407 (S.D.N.Y. 2009).

Against these arguments, Pearson counters that the availability of attorney fees and statutory damages provides individual copyright holders to bring suit individually.  This fact alone does not determine the issue of superiority.  In *Napster*, the class members were also potentially entitled to attorney fees and statutory damages, and the court still found class treatment the superior method for adjudication.  2005 WL 1287611, at *8.  The court there considered the fact that each copyright holder had sought representation through a music agency to license his or her works and collect royalty fees and concluded that this choice "suggests a preference for delegating copyright licensing and enforcement duties that is inconsistent with a widespread desire on the part of absent class members to prosecute their claims in individual actions."  *Id*.  So too here.

Pearson also suggests that class certification is inappropriate because Wu has sought certification only for his copyright claims, but not his state common law claims. Claim-splitting is a concern only "where the class representatives had left aside the far stronger claims for monetary damages and sought to have the weaker claims certified, for dubious strategic purposes." *Coleman v. GM Acceptance Corp.*, 220 F.R.D. 64, 82 (M.D. Tenn. 2004). As the court determined in considering whether to stay Wu's copyright claims pending the outcome of his state law claims in arbitration, the core of Wu's gripe with Pearson is that Pearson has infringed his copyright. Pearson's concerns about claim-splitting are misplaced. The Court has determined that Wu's proposed class, with certain modifications, meets the requirements of Rule 23(b)(3). The Court will now return to the requirements of Rule 23(a). It should be noted that Pearson does not contest the Rule 23(a) factors with the exception of adequacy and ascertainability.

## C.  Numerosity

The first of the Rule 23(a) prerequisites is that "the class is so numerous that joinder of all members is impracticable." Numerosity is presumed when the class contains forty or more members. *Consol. Rail Corp. v. Town of Hyde Park*, 47 F.3d 473, 483 (2d Cir. 1995). Each invoice bills Pearson for the use of many different photographs. For example, a single Minden Pictures invoice dated May 11, 2009 for photographs to be used in a book entitled BIOLOGY 8TH ED., bills for the works of the works of twenty different photographers. (Nelson Decl., Ex. 1.) Numerous such invoices are at stake in this litigation. It is clear that Wu has demonstrated that numerosity is satisfied.

**D.  Commonality and Typicality**

Next, Wu must demonstrate that "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2).  "A court may find a common issue of law even though there exists some factual variation among class members' specific grievances."  *Dupler v. Costco Wholesale Corp.*, 249 F.R.D. 29, 37 (E.D.N.Y. 2008) (internal quotation and citation omitted).  Wu must also demonstrate typicality, meaning that "the claims the claims or defenses of the representative parties are typical of the claims or defenses of the class."  Fed. R. Civ. P. 23(a)(3).  "The commonality and typicality requirements often tend to merge into one another, so that similar considerations animate analysis of both."  *Brown v. Kelly*, 609 F.3d 467, 475 (2d Cir. 2010).  "The crux of both requirements is to ensure that 'maintenance of a class is economical and that the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence.'"  *Marisol A v. Giuliani*, 126 F.3d 372, 376 (2d Cir. 1997) (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 157 n.13 (1982)).  The Court has already determined that common issues predominate with respect to the Minden Pictures invoices, and so the commonality requirement is necessarily satisfied.  The typicality requirement is also satisfied.  Wu argues that Pearson engaged in a common course of conduct, specifically underestimating its print-run needs and then failing to seek additional licensing as necessary.  Wu argues that when Pearson engaged in this practice it infringed his copyright.  Thus, his claims are typical of the class claims.

**E.  Adequacy**

The final requirement of Rule 23(a) is that "the representative parties will fairly and adequately represent the interests of the class."  In order to satisfy this requirement, the plaintiff must demonstrate that class counsel is qualified, experienced, and generally able to conduct the

litigation and that that there is no conflict of interest between the named plaintiffs and other members of the plaintiff class. *Marisol A.*, 126 F.3d at 378. It is apparent from his papers that both Wu and his counsel have dedicated a great deal of time to the pursuit of this litigation and are ably representing the interests of the class.

Pearson argues that Wu is not an adequate representative of photographers who contracted directly with Pearson because he has entered into a settlement with Pearson for claims stemming from direct agreements with Pearson. But it is not clear how the fact that Wu has settled certain claims with Pearson would make him antagonistic to other class members. As Wu correctly observes, the Court need not consider Wu's invoices where a settlement has already been reached. In support of its argument, Pearson cites *In re Schering Plough Corp. ERISA Litig.*, 589 F.3d 585, 599-600 (3d Cir. 2009). But *Schering* is inapposite. There, the plaintiff had signed a general release in return for a severance package. Here, there is no dispute that Wu's claims through the photo bureaus are live claims. It does not appear that Wu has interests antagonistic to that of the class.

**F. Ascertainability**

"Although Rule 23(a) does not expressly require that a class be definite in order to be certified, Second Circuit courts have implied a requirement that a class be identifiable before it may be properly certified." *Friedman-Katz v. Lindt & Sprungli (USA), Inc.*, 270 F.R.D. 150, 154 (S.D.N.Y. 2010). "An identifiable class exists if its members can be ascertained by reference to objective criteria. Where any criterion is subjective, e.g., state of mind, the class is not ascertainable." *Spagnola v. Chubb Corp.*, 264 F.R.D. 76, 97 (S.D.N.Y. 2010) (internal quotation omitted). Pearson appears to argue that the class is not sufficiently ascertainable because the Court will have to make a determination about the merits of each claim in deciding whether a

particular individual is a class member, that is, whether Pearson exceeded the print run.  Of course, the mere fact that class membership overlaps with an element of the plaintiff's legal claim does not mean that the class is not ascertainable.  *See Friedman-Katz*, 270 F.R.D. at 154-55 (S.D.N.Y. 2010) (holding that a class of individuals whose receipts contained more than the last five digits of their credit card number or the expiration date of their credit card number was ascertainable even though these criteria were also elements of the plaintiff's legal claim); *Noble v. 93 Univ. Place Corp.*, 224 F.R.D. 330, 341 (S.D.N.Y. 2004) (certifying a 23(b) class in a collective action of non-exempt employees who were not paid overtime in a case where the defendant contested whether the plaintiffs were entitled to overtime pay).  The question is merely whether class membership can be determined by reference to objective criteria.  *Friedman-Katz*, 270 F.R.D. at 154.

The analysis in *Wilson v. Toussie* is particularly instructive.  01 Civ. 4568, 2008 WL 905903 (E.D.N.Y. Mar. 31, 2008).  There the plaintiffs alleged that the defendants had steered prospective black and Hispanic homeowners to particular neighborhoods and then induced them through deceptive conduct to purchase overvalued homes.  *Id*. at *5.  The court observed that if the plaintiffs had merely confined their class definition to those black and Hispanic purchasers who had been steered to certain neighborhoods pursuant to a blanket policy, this definition would have been ascertainable.  *Id*.  It would be easy enough to determine who had purchased homes from the seller and where.  But the question of whether a particular class member fell victim to deceptive conduct was a fact-intensive inquiry that would require determination by subjective criteria.  *Id*.

Here, the question of whether Pearson exceeded the print run is a fairly mechanical inquiry.  The licensing agreement lists a print run, and Pearson has printed a number of copies of

a textbook that is either greater or less than that number.  The additional requirements that the

Court has proposed, namely that the licensing agreements do not require the arbitration of

copyright claims and allow for litigation in the Southern District of New York, are similarly

mechanical inquiries.  Since class membership is determined by objective criteria, the class is

ascertainable.

*       *       *

The Court holds, therefore, that the class as modified can proceed.  The class shall consist

of:

> All persons or entities entitled to bring copyright claims in their own names or on
> behalf of photographers or other copyright holders (referred to herein as "content
> owners" or "copyright claimaints") whose photographic works were used by
> Defendant in publications that exceeded the authorized print run.  Copyright
> claims subject to exclusive arbitration clauses, requiring the application of foreign
> law, or specifying a venue that is incompatible with the Southern District of New
> York shall be excluded.  The class will also exclude author-supplied images, any
> images for which Pearson owns the exclusive copyright, and images licensed to
> Pearson royalty-free.

The Court will also create a subclass of consisting of class members whose licensing agreements

require that the licensee be billed for overruns before suit can be brought.

## III.    Class Certification—Wu II

In the *Wu II* action, Wu alleges that Pearson often printed photographs in its textbooks

without obtaining a license for these works prior to going to press.  In many cases, Pearson

obtained these photographs from a digital repository of photographs to which Pearson

encouraged photographers to contribute, assuring them that it would obtain a license in the event

that it decided to include a photograph in a textbook.  After the book's publication, Pearson

would then allegedly approach photo bureaus or the photographers and seek licenses for the

photographs without disclosing that it had already included them in its publications.  Wu argues

that each pre-license use of the photograph is an act of copyright infringement, for which he and other potential class members are entitled to compensation.  As with the print overrun claims, the Court will begin its inquiry by considering whether common claims predominate pursuant to Rule 23(b)(3).

### A.  Predominance

Wu argues that common issues will predominate because the Court will be called upon to consider a great deal of common evidence, including evidence of Pearson's systematic practice of obtaining permission after publication as well as its presumed defense that its practice was standard in the industry.  Evidence of Pearson's uniform practice will be relevant to the question of whether Pearson's infringement is considered willful.

Pearson argues that individual issues will predominate because it will seek to introduce evidence that it had permission to publish an unspecified number of the photographs.  In some instances, it argues, the permission was memorialized in the invoice itself, citing instances where the license start date listed on the invoice preceded the date of the invoice itself.  (Def.'s Mem. 31.)  It further contends that it was accepted industry practice to make informal arrangements that Pearson could publish photographs, then to formalize the arrangement later through the use of an invoice.  (*Id.*)  In support of this argument, Pearson points to the fact that non-exclusive licenses under the copyright need not be written in order to be valid.  *See Weinstein Co. v. Smokewood Entmt. Group, LLC*, 664 F Supp. 2d 332, 344 (S.D.N.Y. 2009).

Wu argues that the evidence does not support Pearson's contention that it entered into oral licenses and then later formalized these arrangements through written invoices.  He argues that Pearson employees themselves acknowledge that a license is not created until Pearson receives or often until it pays an invoice.  The proffered deposition testimony is somewhat vague

on this point.  Julie Orr, who appears to have been tasked with bringing Pearson's permissioning into compliance in the wake of this and similar lawsuits, is one such employee.  (Julie Orr Dep., May 3, 2010 (hereinafter "Orr Dep."), 85:23-86:9.)  She testified that she became aware that Pearson's practice of seeking licenses after the fact was problematic through "industry news." (*Id.*, 85: 6-11.)  According to Orr, a number of people came forward with complaints against Pearson and other publishing companies.  (*Id.*)  Prior to these revelations, Orr had not considered the practice problematic because vendors did not raise concerns about it.  (*Id.* 85:23-26:9.)

Elaine Soares, an employee who worked on obtaining permissions during the period when Pearson was engaged in obtaining licenses after the fact, stated that the photo bureaus and photographers had a tacit understanding of Pearson's practices.  Soares stated that in many instances, Pearson would request a high resolution copy of an image before they sent a billing request and that at that stage, it was understood that the picture would appear in the book. (Elaine Soares Dep., April 8, 2010 (hereinafter "Soares Dep."), 96:24-100:12.)  She stated that this understanding was not explicitly worked out.  In her words, "There is an understanding, a working relationship and an understanding, and that is the way the business, the industry has conducted business."  (*Id.* 98:9-13.)  Pearson would later formalize the arrangement through a billing request and an invoice.  When asked whether Pearson would disclose in such situations that the book had already been published, Soares stated,

> There is no need to tell them because it was—it's understood.  There were many
> vendors and many photographers that understand that.  They know how books are
> put together.  So the industry, there was an unspoken—it's not an unspoken rule.
> There was an understanding that you're at press and you're trying to get
> permission because there are numerous times when we're at the printer and we're
> calling photographers or agencies trying to get an image and asking them for their
> verbal okay to proceed.

(*Id*. 38:15-39:4.)  When Pearson eventually sent out billing requests for photographs that had already been published, the request would disclose the fact that the works had already been published in that the request would list the copyright date of the book.  (*Id*. 221:13-25.)

Soares's testimony is in many respects vague and at times contradictory.  Although she states that Pearson obtained licenses prior to publication, it appears that in most cases her proof for this contention is a supposed industry-wide "understanding."  To the extent that Pearson intends to argue that industry practice was to infer a verbal license from a billing request or other communication, this argument is susceptible to class-wide proof.  Nonetheless, Soares also seems to suggest, in her references to "verbal okays to proceed," that Pearson and the photographers or photo bureaus would have conversations where one might infer an oral license from the circumstances of the exchange.  Soares states that in particular instances, she would inform the copyright holders that the book was at the press and ask for their permission to proceed.  Of course, this description of events is somewhat at odds with Soares's characterization of an industry-wide attitude of permissiveness when it came to licensing.  If it was assumed that a license would be granted at the moment Pearson asked for a high resolution image, it is unclear why Pearson would need to engage in these frantic exchanges at the printers.  It is also unclear how often Pearson actually asked for permission to proceed without a written license and how often they relied upon the supposed tacit understanding in the industry.  Nonetheless, the fact that Pearson has unearthed a number of invoices that appear to explicitly grant retroactive rights suggests that at least in some instances, the photo bureaus were aware that Pearson was seeking permission to publish photographs in books that had already gone to press.

As a general matter common issues do not predominate where liability hinges on a variety of oral representations.  *See, e.g.*, *Johnston v. HBO Film Mgmt., Inc.*, 265 F.3d 178, 190

31

(3d Cir. 2001) ("[I]t has become well-settled [sic] that, as a general rule, an action based substantially on oral rather than written communications is inappropriate for treatment as a class action."); *Mullaney v. Delta Air Lines, Inc.*, 258 F.R.D. 274, 279 (S.D.N.Y. 2009) (individual issues predominate where plaintiff's claims turn on whether individual class members received the same or similar representations from airline personnel about rebooking tickets); *McCracken v. Best Buy Stores, LP*, 248 F.R.D. 162, 167-68 (S.D.N.Y. 2008) (individual issues predominate where plaintiff relies on contemporaneous oral representations in an attempt to defeat the plain language of a form contract).  Nonetheless, where liability with regards to the majority of class members can be determined on a class-wide basis by resort to the examination of printed documents, the fact that a court must consider oral communications in a relatively small number of cases does not defeat predominance.  *See Spicer v. Pier Sixty, LLC*, 269 F.R.D. at 338.  From the submissions the parties have made thus far, the Court cannot get a sense for how frequently resolution of the case will require consideration of individualized oral representations.

In addition, it is unclear whether the licensing agreements themselves will allow for the consideration of such evidence.  A number of the licensing agreements, for example the Minden Pictures and Peter Arnold agreements, explicitly state that Pearson was granted a license only after the photo bureau received payment on the invoice.  A number of the licensing agreements also contain integration clauses.  For example, the Peter Arnold agreement states, "The terms set forth in our Delivery Contract and invoice represents our entire agreement concerning the delivery of images to you, your review and usage therof.  All prior understandings or representations, oral or written, based on 'industry custom' or past dealings, are hereby merged in this Contract."

Although copyright law is a matter of federal law, interpretation of the language of licensing agreements is a matter of state law. *Graham v. James*, 144 F.3d 229, 237 (2d Cir. 1998). While state law is generally consistent on issues of contract interpretation, the particular issue raised by Pearson—alleged oral agreements—turns on the admissibility of parol evidence to explain the meaning of a contract. There are some obvious differences among the states on this issue that are not addressed by Wu. For example, the Peter Arnold agreement states that it is to be interpreted in accordance with New York law. New York takes a traditional approach to the parol evidence rule. In New York, "where the language is clear, unequivocal and unambiguous, the contract is to be interpreted by its own language" and extrinsic evidence will not be considered. *R/S Assocs. v. N.Y. Job Dev. Auth.*, 771 N.E.2d 240, 242 (N.Y. 2002). The Minden Pictures agreement, by contrast, calls for the application of California law. California does not apply the parol evidence rule as it is usually conceived. Under California law "[i]f one side is willing to claim that the parties intended one thing, but the agreement provides for another," extrinsic evidence is admissible regardless of how plain the language of the contract may be. *Trident Ctr. v. Conn. Gen. Life Ins. Co.*, 847 F.2d 564, 569 (9th Cir. 1988).

It should be noted that differences in state law do not always present an insuperable barrier to class certification. In *Steinberg*, for example, the court concluded that it could categorize differences in state parol evidence rules as applied to form contracts into four groups and sort class members into four subclasses based on these differences. 224 F.R.D. at 76-79. It is possible that such a resolution is possible here. Nonetheless, "[i]n a motion for class certification, plaintiffs bear the burden of providing an extensive analysis of state law variations to determine whether there are 'insuperable obstacles' to class certification." *In re Currency Conversion Fee Antitrust Litig.*, 230 F.R.D. 303, 312 (S.D.N.Y. 2004) (quoting *In re Ford Motor*

*Co. Ignition Switch Prods.*, 174 F.R.D. 332, 349 (D.N.J. 1997)).  Wu has not met that burden here.

Wu has also requested the Court to certify two subclasses, one of claims stemming from photographs appearing in the same book as Wu's and one of claims stemming from photographs that appeared on the same invoices as Wu's.  Neither of these subclasses cures the problem of oral representations.  Whatever oral licenses Pearson obtained could easily vary from photograph to photograph, even within the same book or invoice.  For example, a Pearson employee could have called one photo bureau to seek a license ahead of time and forgotten to call another.  Or she could have mentioned one photograph when speaking with a photo bureau and not revealed that Pearson also intended to use another photo licensed by the same bureau until she submitted a billing request.  At this point, Wu has not satisfied the Court that common issues will predominate.  If discovery should show that the testimony of Pearson's witnesses does not withstand scrutiny (or, alternately, that Pearson is relying on "industry practice"), Wu may seek leave to renew this aspect of his class certification motion.[5]

## B.  Certification Pursuant to Rule 23(b)(1)(B) or (b)(2)

Wu argues that certification is appropriate pursuant to Rule 23(b)(1)(B), which allows for certification where there is a risk of inconsistent judgments.  Wu seems to argue that certification under this subsection is warranted because any court's opinion on an individual case is likely to have precedential effect for the rest.  In order to invoke this subsection, however, "the party seeking class certification must be able to allege something more than that an individual adjudication may be given stare-decisis effect in other lawsuits . . . ."  7AA Charles Alan Wright,

---

[5] The Court questions whether individualized issues would predominate over common issues if discovery were to show that the number of oral agreements was *de minimis*.  Any renewed motion should provide a survey of state law pertinent to the parol evidence rule.  *See Steinberg*, 224 F.R.D. at 79.

Arthur R. Miller & Mary Kay Kane, FEDERAL PRACTICE AND PROCEDURE § 1774 (3d ed. 2005). Wu has made no such showing.  Class certification is not appropriate under this subsection.

Wu also argues that certification is appropriate under Rule 23(b)(2).  In the intervening period between briefing and the issuance of this opinion, the Supreme Court issued an opinion in *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541 (2011).  This case restricted the availability of Rule 23(b)(2) certification in situations where a plaintiff seeks both damages and injunctive relief, holding that such cases may not be certified where "monetary relief is not incidental to the injunctive or declaratory relief." *Id.* at 2557.  It is clear that Wu's copyright claims for damages are not incidental.  Class certification is therefore inappropriate under this subsection.

<h1 style="text-align:center">CONCLUSION</h1>

For the foregoing reasons, Pearson's motion for reconsideration [09 Civ. 6557, 91] is DENIED.  Wu's motion for class certification with respect to the *Wu I* action [09 Civ. 6557, 103] is GRANTED with the modifications noted above.  Wu's motion for class certification with respect to the *Wu II* action [10 Civ. 6537, 17] is DENIED.  Pearson's motion to dismiss the *Wu II* [10 Civ. 6537, 11] action is WITHDRAWN.  With regards to the *Wu II*, Wu may conduct additional class discovery of the defendant and of third party witnesses to determine whether the defects described in this opinion can be cured.  The parties are directed to meet and confer regarding a proposed discovery schedule and submit the schedule to the Court within fourteen days of the date of this order.

**SO ORDERED.**

Dated: New York, New York
September 30 2011

Richard J. Holwell
United States District Judge

35