USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: JUL 1 8 2012

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
NORBERT WU, Individually and on Behalf    :
of All Similarly Situated Persons,        :          09 Civ. 6557 (KBF)
                                          :
                          Plaintiff,      :
                                          :
              -v-                         :
                                          :
PEARSON EDUCATION INC.,                   :
                                          :
                          Defendant.      :
----------------------------------------X

KATHERINE B. FORREST, District Judge:

     IT IS HEREBY ORDERED,

     The parties are directed to review the attached decision

and notify the Court by July 23, 2012, whether any party would

like to move for decertification, or any other ruling related to

the class previously certified in this action.

SO ORDERED:

Dated:     New York, New York
           July 17, 2012

                              _____
                                   KATHERINE B. FORREST
                              United States District Judge

```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------ X
                                     :
PALMER KANE LLC,                     :
                        Plaintiff,   :
                                     :
           -v-                       :
                                     :
SCHOLASTIC CORPORATION,              :
                        Defendant.   :
                                     :
------------------------------------ X
```

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 7/16/12

11 Civ. 7456 (KBF)

MEMORANDUM & ORDER

KATHERINE B. FORREST, District Judge:

   Plaintiff, Palmer Kane LLC ("Palmer Kane" or "plaintiff"), brings this purported class action alleging that Scholastic Corporation ("Scholastic" or "defendant") committed widespread copyright infringement of images it used in certain of its books by (1) printing more copies of the books than was allowed under the licenses it held in the images (the "overrun" claims) and (2) by publishing the books prior to obtaining a license, or without ever obtaining a license, in the images (the "unauthorized use" claims).

   Plaintiff now moves for class certification pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure. For the reasons set forth below, the motion for class certification is denied.

BACKGROUND

I.  Defendant Scholastic

Defendant Scholastic has, since its founding in 1920, been a designer and developer of educational publications and services. One of its core products is the READ 180 Program ("READ 180"), designed to assist schools in developing students' reading skills. (Else-Mitchell Decl. ¶¶ 2-3.) READ 180 was first published in 1999 and updated in 2005 (the "Enterprise" edition) and 2011 (the "Next Generation" edition). (Id. ¶ 2.) This action relates solely to the updated editions.

The READ 180 program has multiple components geared toward students, teachers and school administrators: printed workbooks, instructional software, electronic books, paperback books and videos. (Id. ¶ 4.) Scholastic produces the program in "Stages"--Stage A materials are for elementary school students; Stage B materials are for middle school students; and Stage C materials are for high school students. (Id.) The printed components of the materials that make up the READ 180 program contain thousands of illustrations and photographs. (Id. ¶ 7.)

The process by which Scholastic sought to obtain licenses for the use of thousands of images in READ 180 consisted of multiple steps. In opposition to this motion, Scholastic has submitted the declaration of Steven Diamond, Executive Director of the Photography Resources Department at Scholastic

2

("Photography Resources")--the department tasked with identifying images for use in READ 180, contacting licensors regarding obtaining licenses to use the images and facilitating payment for such use. (Diamond Decl. ¶¶ 1-2.) Mr. Diamond, in his declaration and deposition testimony, attests to Scholastic's process for obtaining licenses for images used in READ 180.

Mr. Diamond explains that Scholastic personnel spoke directly with representatives of copyright owners (hereinafter referred to as "rights holders") and/or licensing agents for rights holders. (Id. ¶ 4.) The majority of these licensing agents were "stock photo houses." (Id.) The stock photo houses keep collections of images available to be licensed so that companies like Scholastic can have access to one database from which to choose images for use in their products.

According to Mr. Diamond, individuals in Photography Resources "review the database of available images from the agency's collection, usually online, and then indicate which of the stock photographs Scholastic would like to use." (Id. ¶ 5.) Mr. Diamond explains that, "[o]nce Scholastic determines whether it will in fact use a particular image, and precisely how it will be used in terms of size, placement, territory and print run quantity, [it] informs the stock photo house or other licensor often verbally or by email." (Diamond Decl. ¶ 5.) At

3

times, Scholastic also sends a formal request for an invoice to the licensor. (Id.  See also Nelson Decl. Ex. 5.)  Mr. Diamond states that the "invoice amount generally is based upon a pre-negotiated and/or pre-established price list set by the stock photo or other agency, which is typically set forth in the applicable Preferred Vendor Agreement." (Diamond Decl. ¶ 6.)

The Preferred Vendor Agreements appear to be contracts between Scholastic and individual photo houses that set forth the terms for Scholastic's use of images that it pulls from the photo house's database; the agreements do not refer to any particular images. The titles of the agreements include "Terms of License" (Rosenthal Decl. Ex. 10), "License Terms" (id Ex. 11) and "Price Agreement" (id. Ex. 15).

On this motion, Scholastic has submitted Preferred Vendor Agreements that it had with eight different photo houses that were licensing agents for images used in READ 180. (Id. Exs. 11-19.)  The agreements appear to have been individually negotiated with Scholastic personnel in Photography Resources (see e.g., id. Ex. 15 ("Agreed with Steve Diamond . . . Director of Photography and Oren Silverstein")) and the terms of these agreements differ in material ways. Germane to this matter are those provisions related to the price to be paid for the use of an image in a product, the price to be paid for the reuse of an

image in additional products and the process of paying for such use.

The pricing terms in the Preferred Vendor Agreements at issue here differ depending upon which photo house was a party to the agreement with Scholastic. All but two agreements, however, base the listed prices on the number of copies printed of the book in which the image was to be used (the "print run"). (Id. Exs. 16, 11.) Some agreements provide prices for print runs up to 1 million (id. Exs. 10, 12); others provide prices for print runs up to 1.5 million (id. Exs. 13, 14); and the largest share of agreements provide a price for an unlimited number of print runs (id. Exs. 15, 17, 18).

With regard to the reuse of an image, no three agreements are identical. Some agreements permit reuse of images within a particular time frame for free (see id. Ex. 11) and others permit reuse at an additional cost no matter the timing (see id. Exs. 10, 12, 13, 14, 15, 16, 17, 18). For those Preferred Vendor Agreements that permit reuse at an additional cost, the cost is either the same as that set for the original license or discounted; for those that are discounted, the discount is either a flat fee or a percentage of the original rate. (Id.) Moreover, the cost of reuse often depends upon whether the reuse is in the same product title or a whole new product line. (Id.)

The mechanism by which Scholastic was to pay and/or alert the photo houses as to its use of a particular image is also noted in some, but not all, of the Preferred Vendor Agreements. In one Preferred Vendor Agreement, for instance, there is a provision entitled "Invoicing/Usage Notification" that addresses the timing of the issuance of invoices and what is to be included in them:

> Scholastic agrees to notify [the photo house] of the Images used on a per usage basis.  Scholastic must include IDs within each notice.  [The photo house] will invoice Scholastic according to this schedule. Overdue statements will be sent to Scholastic after 30 days.  Scholastic is responsible for all payments due.

(Id. Ex. 10.)  Another Preferred Vendor Agreement contains a similar provision that regards timing but leaves out what is to be included in invoices: "Scholastic has to continue to report usage of new downloads."  (Id. Ex. 11.)  And, in yet another Preferred Vendor Agreement, there is a provision regarding solely the content of the invoices that does not address the timing of issuance: "Invoice to state[:] Rights granted for print and electronic versions, all supplementary e-usages (web, DVD, e-book, powerpoint downloads)."  (Id. Ex. 15.)

Scholastic received the invoices in response to "Invoice Requests" it sent to photo houses; these Invoice Requests list, inter alia, the image name, size, print run, whether it is a reuse and the "RightsType" (which is not defined but this Court

6

assumes to mean the type of rights granted by the stock photo
house to Scholastic).  (See e.g., Nelson Decl. Ex. 5.)  The
Invoice Requests sent out by Scholastic for the images used in
READ 180 appear to be fairly standard with respect to the print
runs and RightsTypes listed--the print runs are listed as
500,000 and the RightsTypes are listed as "RM."  (Id.)
Plaintiff posits that "RM" stands for "rights-managed" and means
"that the licenses expressly restricted the manner in which
Defendant could use the photos."  (Pl.'s Br. at 1.)

     The invoices that Scholastic received from the photo houses
in response to these requests contain descriptions of what
Scholastic was paying for--including, inter alia, a description
of the picture, the quantity of its distribution, the size of
its use and the location of its placement in the READ 180 book.
(Nelson Decl. Exs. 1, 7, 11, 37.)  In addition, certain invoices
contain terms such as "License Start Date" and "License End
Date" or similar terms along with corresponding dates (id. Exs.
7, 11); other invoices only contain an "Invoice Date" (id. Ex.
37).  The invoices also dictate, in a number of instances, that
the "Rights" granted are "one time non-exclusive" (id. Ex. 1);
though, not all invoices contain this term (id. Ex. 37 (AP
invoice)).  Some photo stock houses, according to Mr. Diamond,
issued invoices after several communications with Scholastic and

may have issued multiple invoices as a result of mistakes in the
original invoice.  (Diamond Decl. ¶ 6.)

Scholastic argues that, given the complexities involved in
the process of producing READ 180--including the fact that
Scholastic was to produce its materials in time for the start of
various school years--the Court must look at the Preferred
Vendor Agreements and, more generally, Scholastic's
relationships, to determine the terms of any license Scholastic
had or has in a particular image.

Although according to both parties stock photo houses
represented the majority of images in Enterprise and Next
Generation, Scholastic also spoke directly with rights holders
regarding licensing images for use in READ 180.  Unlike the
relationships between Scholastic and the rights holders'
licensing agents, the parties have provided few indications of
the process by which Scholastic obtained licenses directly from
rights holders.  However, for an understanding of the extent to
which these interactions were individualized, the Court looks to
the general process by which Palmer Kane provided licenses to
use its images.

II.  Plaintiff Palmer Kane

Plaintiff Palmer Kane, a purported rights holder in
photographic images taken by Gabe Palmer, licenses the work of
Mr. Palmer whose images were used in the Enterprise and Next

8

Generation editions of READ 180.  Plaintiff's complaint, filed
on October 1, 2011, asserts a single cause of action for
copyright infringement under the Copyright Act of 1976, 17
U.S.C. §§ 101, et seq.  Specifically, plaintiff argues in its
complaint that Scholastic infringed the copyrights of two of its
images--the "Paramedics" photo and the "Troubled Student" photo.
The complaint alleges that plaintiff owns the copyrights in
these photographs, which were allegedly either licensed to
Scholastic for limited uses and subject to specific terms and
conditions that Scholastic disregarded or never licensed at all.
In addition to the Paramedics and Troubled Student photos,
plaintiff now also asserts that the copyright for the image
titled "Speeding Ambulance" has been infringed.

     With the exception of the Paramedics photo in Next
Generation, Palmer Kane used a licensing agent (the photo stock
house Corbis Corporation ("Corbis")) to license its images in
READ 180.  Palmer Kane's "Photographer Representation Agreement"
with Corbis (the "PRA"), dated October 3, 2003, details the
terms of the agency relationship.  (See Rosenthal Decl. Ex. 19.)
The PRA gives each party certain rights to determine, at
different stages and under different conditions, the breadth of
any licenses granted to use an image.  For instance, under the
PRA Palmer Kane was able to decide at the time it submitted an
image to Corbis the extent to which a license could be granted

to use that image.  (Rosenthal Decl. Ex. 19 at 1 ("At the time you submit your images, you may specify that an image is not available for a category listed below and you may notify Corbis of any restrictions on the use of the image").)  If Palmer Kane did not restrict the usage of an image, the PRA granted Corbis the authority to determine at its "sole discretion the terms and conditions of any license or distribution" of the image.  (Id. at 3.)  Should Corbis "desire to license" one of Palmer Kane's images "for a use not otherwise permitted under" the PRA, Corbis was permitted to do so "on terms consistent with those granted by Corbis to its third party clients."  (Id.)

The one image at issue that was not represented by Corbis with regard to the Next Generation edition of READ 180 is the Paramedics photo.  Scholastic included Paramedics in an invoice request, sent to Corbis on May 18, 2011, for photographs to be used in Next Generation.  (Nelson Decl. Ex. 5.)  In fact, Corbis was not acting as the licensing agent for this image at that time.  (Id. Ex. 6.)  Corbis informed Scholastic of this shortly after the invoice request was sent.  (Id.)  Thereafter, on May 23, 2011--after Next Generation had been published--Scholastic contacted plaintiff directly regarding the use of the Paramedics photo.  (Id. Ex. 8.)

Although Patricia Kane, the founder and member of Palmer Kane, was not speaking as to the Paramedics photo in particular,

10

she explained in a deposition, as plaintiff's 30(b)(6) designee, her process for providing a license to use a Palmer Kane image:

> When the purchase order, or sometimes it's verbal, is received -- this is only for me -- and they agree to my terms, we feel they can go ahead. But until the bill is paid -- it states right on my invoice -- until the bill is paid and the sample received, that the license has not been granted.

(Kane Dep. (Rosenthal Decl. Ex. 1) at 137:17-23.) Ms. Kane went on to explain that these "negotiation[s regarding the use of the image]" would go "back and forth" via email. (Id. at 138:10-16.)

Whether the licensor for the use of these photos was a rights holder or photo stock house, the theory of plaintiff's claims is the same: Scholastic committed copyright infringement by using images in READ 180 without prior permission and in excess of agreed-upon restrictions. (Id. ¶ 17.) According to plaintiff, when Scholastic obtained a license, that license, along with restrictions as to its use, was only granted as of a date listed on the invoice. (Pl.'s Br. at 1 (citing Nelson Decl. Ex. 1).) Plaintiff argues that the terms listed on the invoices are binding restrictions on the licenses granted for the images used in READ 180. (Id.)

For instance, plaintiff claims that the invoices at issue here "limited the quantity of books that Defendant could distribute to 500,000 copies." (Id.) Plaintiff argues that

11

when defendant printed books in excess of 500,000 containing the image, it infringed its copyright--*i.e.*, it engaged in a print "overrun" of the image. Likewise, when defendant printed a book containing the image prior to the date designating the start of the license on the invoice, or without an invoice ever being issued, it infringed its copyright--*i.e.*, it carried out an "unauthorized use" of the image. This allegedly widespread infringement, according to plaintiff, was a result of defendant's "fail[ure] to implement an adequate copyright compliance program." (Pl.'s Br. at 4.)

Plaintiff here seeks to certify two classes or a single class with two subclasses that track its overrun and unauthorized use claims:

> The "overrun" class would include rights holders whose photographic works were used by Defendant in any READ 180 publication in excess of the licensed print run. The proposed "unauthorized use" class would include rights holders whose works were published in a READ 180 component without Scholastic having obtained the requisite license before the printing date.

(Pl.'s Br. at 5.)

DISCUSSION

I.   Requirements for Class Certification

A plaintiff seeking to certify a class must prove by a preponderance of the evidence that its proposed class meets the requirements of Rule 23(a) and, if those requirements are met, that the class is maintainable under at least one of the

12

subdivisions of Rule 23(b).  See Teamsters Local 445 Freight

Div. Pension Fund v. Bombardier Inc., 546 F.3d 196, 202 (2d Cir.

2008).

Rule 23(a) states that a party may be a class

representative only if:

> (1) the class is so numerous that joinder of all
> members is impracticable; (2) there are questions of
> law or fact common to the class; (3) the claims or
> defenses of the representative parties are typical of
> the claims or defenses of the class; and (4) the
> representative parties will fairly and adequately
> protect the interests of the class.

Fed. R. Civ. P. 23(a).

The subdivision of Rule 23 that plaintiff seeks to certify

a class under is (b)(3), which allows certification "if the

questions of law or fact common to class members predominate

over any questions affecting only individual members, and . . .

a class litigation is superior to other available methods for

fairly and efficiently adjudicating the controversy."  Fed. R.

Civ. P. 23(b)(3).

"In evaluating a motion for class certification, the

district court is required to make a 'definitive assessment of

Rule 23 requirements, notwithstanding their overlap with merits

issues,' and must resolve material factual disputes relevant to

each Rule 23 requirement."  Severin v. Project Ohr, Inc., No. 10

Civ. 9696, 2012 WL 2357410, at *4 (S.D.N.Y. June 20, 2012)

(quoting Brown v. Kelly, 609 F.3d 467, 475 (2d Cir. 2010)).

The district court must "receive enough evidence, by affidavits, documents, or testimony, to be satisfied that each Rule 23 requirement has been met." Id. (quoting Teamsters Local 445, 546 F.3d at 204).

"What matters to class certification is not the raising of common 'questions'--even in the droves--but, rather the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation. Dissimilarities within the proposed class are what have the potential to impede the generation of common answers." Salon FAD v. L'Oreal USA, Inc., No. 10 Civ. 5063, 2011 WL 4089902, at *5 (S.D.N.Y. Sept. 14, 2011) (emphasis in original) (quoting Wal-Mart Stores, Inc. v. Dukes, 131 S. Ct. 2541, 2551 (2011)).

With regard to the Rule 23(a) criteria, defendant contends that plaintiff is not typical of the purported class and there are no common questions of law to the class. The Court need not address Rule 23(a), however, because plaintiff does not show that a class can be certified under the "predominance" requirement of Rule 23(b)(3).

At the core of plaintiff's allegations is that Scholastic exceeded the scope of licenses that it negotiated with agents of rights holders or rights holders themselves. Because in order to answer whether Scholastic in fact held a license to use those images will necessarily involve, and depend upon, inquiries into

14

a multitude of individual relationships and interactions
(between Scholastic and the rights owner; between Scholastic and
the licensing agent; between the rights owner and the licensing
agent), common questions of law or fact do not predominate over
individual questions and a class action would not fairly and
efficiently adjudicate these issues.  Thus, although plaintiff
may raise common questions--such as defendant's practices with
regard to obtaining licenses--the generation of common answers
here is unlikely.

II.  Predominance

"The 'predominance' requirement of Rule 23(b)(3) 'tests
whether proposed classes are sufficiently cohesive to warrant
adjudication by representation.'"  Myers v. Hertz Corp., 624
F.3d 537, 547 (2d Cir. 2010) (quoting Amchem Prods., Inc. v.
Windsor, 521 U.S. 591, 623 (1997)).  "The requirement's purpose
is to ensure that the class will be certified only when it would
achieve economies of time, effort, and expense, and promote
uniformity of decision as to persons similarly situated, without
sacrificing procedural fairness or bringing about other
undesirable results."  Id. (internal quotation marks and
alterations omitted).  "Economies of time, effort, and expense
in fully resolving each plaintiff's claims will only be served,
and the predominance requirement satisfied, if the plaintiff[]
can show that" the question at issue--i.e., whether defendant

15

committed copyright infringement according to plaintiff's overrun and unauthorized use claims--"can be answered with respect to the members of the class as a whole through generalized proof and that those common issues are more substantial than individual ones." Id. at 549.

The crux here is the scope of the licenses that Scholastic held in the images it used in its READ 180 program. Palmer Kane's argument is that a license issued for a particular image as of a date indicated on the invoice and the scope of that license is limited by the terms of the invoice--i.e., according to plaintiff, the Court does not need to look beyond the invoices to determine the scope of the licenses granted. Palmer Kane points to the "standardized request forms" used by Scholastic to request invoices and the invoices themselves as evidence that the scope of the licenses granted are identical across the purported class. (See e.g., Nelson Decl. Exs. 5, 7.) According to Palmer Kane, when Scholastic went beyond the scope of the licenses, they did so as to all purported class members and as a result of company policy and practice--thus making their claims subject to generalized proof. (See e.g., Pl.'s Br. at 24-25 (citing Diamond Dep. (Nelson Decl. Ex. 2) at 178-180, 177-178, 269-273).)

Scholastic argues that, based upon a course of conduct with the stock photo houses, memorialized in Preferred Vendor

16

Agreements, it is permitted to use images prior to receiving an invoice and beyond the terms of the invoice provided that it pay for such use in accordance with the terms of its agreements and understandings with the stock photo houses. Accordingly, Scholastic asserts, the Court must refer to the Preferred Vendor Agreements in order to determine the scope of the licenses granted by stock photo houses. As to those licenses granted directly by rights holders, Scholastic argues that here too they engaged in individual negotiations and formed individual relationships with photographers and other rights holders--and, as a result, an inquiry into the terms of licenses granted by rights holders to Scholastic would unavoidably involve numerous individualized analyses.

Scholastic also maintains that, with regard to its unauthorized use claim, it had an implied license to use images prior to completing an invoice and payment for an express license. Although the parameters of when an implied license has been conveyed are not clear, "the question comes down to whether there was a meeting of the minds between the parties to permit the particular usage at issue." Psihoyos v. Pearson Educ., Inc., No. 10 Civ. 5912, 2012 WL 676352, at *15 (S.D.N.Y. Feb. 29, 2012) (internal quotation marks omitted). Consequently, Scholastic contends, the Court must look at each photograph and

license individually and refer to extrinsic evidence in order to ascertain whether Scholastic infringed a particular copyright.

A review of the various contractual relationships at issue here makes clear that generalized proof will not suffice and individual issues outweigh common ones in the purported class.

A. Scholastic and the Photo Houses

As explained above, Scholastic and the photo houses that act as licensing agents--which, for plaintiff, was Corbis-- entered into what Scholastic calls "Preferred Vendor Agreements" that set out terms of the two parties' licensing arrangement with respect to future images without regard to any specific image.  These agreements are far from uniform.  They differ as to, inter alia, usage rights, print run limitations, invoicing practices and the reuse of images (both ability to reuse and pricing for reuse)--all issues that are central to the claims asserted here.

Scholastic argues that the Preferred Vendor Agreements determined the scope of the licenses granted for each individual image licensed by one of the photo houses.  (Def.'s Br. at 24- 25.)  The invoices, defendant argues, "served as a 'notice' to the vendor that Scholastic used an image and would pay according to the previously negotiated Preferred Vendor Pricing structure."  (Id. at 25.)

Palmer Kane argues the opposite--that, in fact, these agreements are red herrings and the Court need "only" look at the invoices to determine the strictures of any licenses granted. (Pl.'s Reply Br. at 16.) Plaintiff states that, even if the Preferred Vendor Agreements reflect negotiated rates, Scholastic was not necessarily granted any rights until the issuance of an invoice. (Id. at 17.)

Whether or not these Preferred Vendor Agreements make up part of the licensing arrangement, the Court need not decide now--they will surely inform any analysis of the terms in the invoices and whether Scholastic had an implied license to use images prior to being granted an explicit license. Thus, even if, as plaintiff argues (Pl.'s Br. at 25-26), there are in the invoices issued "few, if any, discrepancies in the print-quantity terms" (for purposes of the overrun claim) and "determining license dates will not require significant individual inquiry" (for purposes of the unauthorized use claim), numerous inquiries will be required to determine the scope of the licenses granted because the terms of the Preferred Vendor Agreements differ depending upon the photo house that was a party to the agreement.

Where, as here, there is arguably a form license (i.e., the invoices for Enterprise and Next Generation) with form terms used across a class, common issues will not necessarily outweigh

19

individual ones when those terms must still be individually
interpreted.  C.f., Spagnola v. Chubb Corp., 264 F.R.D. 76, 98
(S.D.N.Y. 2010) ("[C]ourts have denied certification even in
cases that involved form contracts where numerous individual
inquiries were required to determine whether a breach of the
contract could be found.") (collecting cases).  See also Sacred
Heart Health Sys., Inc. v. Humana Military Healthcare, 601 F.3d
1159, 1176-77 (11th Cir. 2010) ("Even the most common of
contractual questions-those arising, for example from the
alleged breach of a form contract-do not guarantee predominance
if individualized extrinsic evidence bears heavily on the
interpretation of the class members' agreements.").

    Moreover, the Preferred Vendor Agreements are a product of
negotiations between personnel at Scholastic and the photo
houses.  Any inquiry into their terms will involve a review of
representations that are individualized and vary case by case
(as evidenced by the differing terms of the Preferred Vendor
Agreements).  Such an inquiry is not suited for class action
litigation.  See e.g., Moskowitz v. La Suisse, --- F.R.D. ----,
2012, WL 1080125, at *5 (S.D.N.Y. Mar. 30, 2012) ("Plaintiffs'
contract claims are supported by oral representations . . . and
the records shows that these representations were not uniform .
. . These individualized inquires required to assess the claims

makes them inappropriate for treatment as a class."); Ingenito
v. Bermec Corp., 376 F. Supp. 1154, 1169 (D.C.N.Y. 1974).

     At the June 15, 2012 hearing, counsel for plaintiff posited
that the Court could limit the inquiries by certifying a class
of rights holders that used the same licensing agent (and thus
whose images may have been subject to the same Preferred Vendor
Agreements). (Hr'g Tr. at 19-21, June 15, 2012.) Such a
proposed class is, for additional reasons, not certifiable.
Such a class overlooks another relationship that would be
critical in any analysis of the claims here: the relationship
between the rights holder and its licensing agent.

          B. The Stock Photo Houses and the Rights Holders

     The relationship between Palmer Kane and Corbis was
governed by the PRA signed by both parties. As the Court
explained above, included among the terms in the PRA are
provisions that, inter alia: allowed Palmer Kane to dictate the
extent to which a particular image could be licensed when it was
submitted to Corbis (id. at 1); granted Corbis the ability to
license an image "for a use not otherwise permitted under" the
agreement "on terms consistent with those granted by Corbis to
its third party clients" (id. at 2); and gave Corbis "sole
discretion" to determine "the terms and conditions of any
license or distribution" "subject to the rights granted and
restrictions imposed" by the agreement (id. at 2).

Presumably, contracts similar to the PRA were agreed to by
other rights holders whose images were licensed by stock photo
houses.  It is conceivable, therefore, that each rights holder
in the purported class had the authority to dictate, and in fact
may have consistently or sometimes dictated, the parameters of
any licenses granted to use its images.  The same can be said of
photo houses that were subject to an agreement like the PRA--
they too may have exercised discretion granted under their
agreements with rights holders to set the parameters of any
license they granted.  Accordingly, within even this purported
class, each license obtained by Scholastic may have had
different limitations placed on it by its rights holder and/or
licensing agent--making an inquest into the nature of the
alleged infringements difficult (and maybe impossible) to
resolve on a classwide basis.

Based on the current record, it is also likely that the
agreements between other rights holders and their licensing
agents differ from the PRA signed by Palmer Kane and Corbis.  In
fact, like the parameters of the license, the agency authority
given to the stock photo houses may vary by rights holder
depending on the agency agreements between the two--and the
restrictions placed on the photo house/licensing agent bears
directly upon the actual terms of the licenses that they
granted.  C.f. Psihoyos, 2012 WL 676352, at *21 ("Potentially,

22

if Getty retained actual or apparent authority to offer licenses of Plaintiff's works after December 2008, Defendants could argue that the 'knowledge and acquiescence' of Getty alone gave rise to an implied license. . . On the other hand, if Getty did not have any such authority, then Plaintiffs could argue that [Defendant's] course of conduct with Getty is irrelevant to whether Defendants had an implied license."). This is yet another individual inquiry that the Court would have to make if it were to certify a class here.[1]

### C. Scholastic and the Rights Holders

In addition to obtaining licenses from a photo house acting as a licensing agent, Scholastic also obtained licenses directly from rights holders. (See e.g., Nelson Decl. Exs. 13-14.) Plaintiff's founder and Rule 30(b)(6) witness, Patricia Kane, testified to her process for providing licenses for any Palmer Kane images. She explained that, "only for [her]", once a publisher "agree[s] to [her] terms" and "until the bill is paid and the sample received", "the license has not been granted." (Kane Dep. (Rosenthal Decl. Ex. 1) at 137:15-138:16.) Ms. Kane explained that this would occur after a "negotiation back and forth" over "any parameter" regarding the license. (Id.)

---

[1] Moreover, any agreement between a rights holder and licensing agent may determine for each individual rights holder whether any claim it has would be more appropriately brought against their licensing agent for breach of contract (if the agent went beyond the bounds of its authority), rather than copyright infringement against Scholastic.

The individualized inquiries necessary to determine the breadth of the licenses granted by each individual rights holder, as a product of individual negotiation processes (like the one depicted by Ms. Kane), is yet another factor militating against granting class certification. C.f., McCracken v. Best Buy Sores, L.P., 248 F.R.D. 162, 168 (S.D.N.Y. 2008) (individual issues predominate where breach of contract and unjust enrichment claims depend on individual communications between defendant and plaintiffs); Cohn v. Massachusetts Mut. Life Ins. Co., 189 F.R.D. 209, 214-15 (D. Conn. 1999) (same).

At base, plaintiff has failed to demonstrate by a preponderance of the evidence that it can prove its claims--on a class-wide scale--by referring to generalized proof. Accordingly, its motion to certify a class is denied.

CONCLUSION

For the reasons set forth above, plaintiff's motion for class certification is DENIED. The Clerk of the Court is directed to terminate the motion at Docket No. 34.

SO ORDERED.

Dated:   New York, New York
         July 16, 2012

                                        /s/ K. B. Forrest
                                        _____
                                        KATHERINE B. FORREST
                                        United States District Judge

24